Bossie T. PRICE, Plaintiff-Respondent,

v.

FORD MOTOR CREDIT COMPANY,
Defendant-Appellant.

No. KCD 26901.

Missouri Court of Appeals,
Kansas City District.

Oct. 6, 1975.

Motion for Rehearing and/or Transfer
Denied Nov. 3, 1975.

James B. Lowe, Michael H. Fishman, Kuraner, Dingman, Brockus, Kinton & Lowe, Kansas City, for defendant-appellant.

Arthur C. Popham, Jr., Popham, Popham, Conway, Sweeny & Fremont, Kansas City, for plaintiff-respondent.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

DIXON, Judge.

Defendant Ford Motor Credit Company appeals from a jury verdict of $600 actual and $25,000 punitive damages for wrongful conversion of plaintiff Bossie T. Price's automobile. Plaintiff purchased the automobile in 1969 under a retail installment contract which was assigned to defendant. Payments were due the twenty-eighth day of each month. A combination of faulty bookkeeping by defendant and the loss of one payment in the mail resulted in steps that led to repossession of the automobile by defendant on April 6, 1971.

Prior to the consideration of the events of March and April of 1971, the history of the Price accounts needs to be related. The Price account was paid late on many occasions. On several of these occasions, the defendant undertook collection activity. Significantly, although the payment was often late, the defendant had not exercised its right to accelerate. In July, 1970, an agent of the defendant, acting pursuant to directions from the then officer in charge at Gary, Indiana, called on plaintiff and received a cash payment. For this, he gave a receipt, and pursuant to his directions, forwarded the funds to the Gary office. He designated the payment with the account number given to him as being that of plaintiff in the written instructions received from the defendant's office. The account number was erroneous, and the payment was never properly recorded to plaintiff's account until plaintiff's lawyer, in the course of taking depositions, caused it to be located and properly identified. There was also an error in the summary of payments for collection purposes because of a clerical error in failing to include in the computer data a payment made in July of 1969. Both of these errors which had the cumulative effect of showing plaintiff's account two months delinquent when it was not were solely the result of errors by defendant's personnel. Thus, in January and February, Mr. Grasa, the person in charge of the collection of the Price account, was possessed of erroneous information as to the status of plaintiff's account. The correct status of plaintiff's account in January of 1971 was that it was current, a fact which some of the defendant's records reflected, as testified to at trial. Thus, some agents of the defendant knew or should have known of the correct status of the account. This confusion in the defendant's record keeping carried on through the preparation for trial, the defendant filing just before trial amended answers to interrogatories showing the correct status of the account.

The events occurring in March and April of 1971, considered in the light of this history of the account, pose the issues.

On April 1, defendant's employee, Paul Colyer, called at the Price home demanding payment. Mrs. Price claimed the payments had been made and showed him receipts for money orders made out in the amounts due and payable to defendant. Mr. Colyer took no action, but called Grasa.

A payment had been due on February 28. Plaintiff was in Gary, Indiana working, and he purchased a money order and mailed it

in the envelope provided by the defendant. The defendant also purchased another consecutively numbered money order to another payee mailed at the same time, and in due course, received by that payee. The one to defendant was never cashed and, ultimately, plaintiff received reimbursement from the money order company.

In any event, Mr. Grasa, on March 22, ordered repossession of plaintiff's car. This was six days prior to the due date of the March 28 payment. Admittedly, Grasa was acting on the assumption that plaintiff owed three payments when, in fact, assuming no receipt was made by defendant of the February money order, only one payment was due.

Mr. Grasa spoke by telephone with Mrs. Price on April 2. She gave him the numbers of the money orders. He told her that defendant would not repossess the car until she could verify whether the money orders had been received. Nevertheless, Mr. Grasa did not inform defendant's repossession agent, who had been notified on March 22 to repossess the Price automobile, about this promise. Nor did Mr. Grasa investigate to determine if the money orders had been issued. There was no further contact between plaintiff and defendant until April 6 when the car was repossessed.

In the meantime and on March 26, the payment which plaintiff thought was due March 28 was received by defendant's agent. There is a dispute as to when the information as to this payment would or should have reached Grasa, but in any event, it was received at a bank lock box on March 26, eleven days prior to the repossession.

Thus, when all is said and done, the welter of evidence concerning payments boils down to the basic factual situation that Grasa should have known that plaintiff was only one payment in arrears. He further knew by his own admission that plaintiff claimed to have purchased a money order and mailed it to defendant. By the admission in its answer filed, the defendant claims Grasa promised only to check the lock box for the missing payment, an action he never took, for by the defendant's own testimony, Grasa would have discovered the March 26 payment by any sort of a check of payments made by plaintiff, and that would have apprised him that the order of March 22 to repossess was premature but for the mistaken belief that plaintiff was three payments in arrears.

The evidence offered by the defendant and its exhibits show that there were two separate computerized records made by the defendant. One might be characterized as a serial listing of accounts showing current payments and the other an account receivable ledger which showed the current balance and reflected all payments credited. *Both* of these records were in error until after the litigation had progressed to the stage of depositions. The account receivable ledger was in error as to only one payment (the July, 1970 payment misidentified by defendant with an incorrect account number). Grasa, even after repossession, never checked the more basic account receivable ledger for, in his preparation of the repossession analysis, he used a balance of $1,604.32, which accounts for only twenty payments, while it is conceded the plaintiff made 21 payments.

The confusion engendered by the evidence does not stand alone. The pleadings and instructions are also confusing. Plaintiff pleaded in four counts, two were dismissed during trial, and two counts (I and II) remained at the time of submission. In prolix fashion, Count I pleaded a cause of action in conversion based on wrongful repossession on alternative *factual* grounds, viz., first, that all payments had been timely made, and the defendant had no right to repossess, or second, that defendant promised not to repossess until an opportunity was afforded to check on the receipt of payments. This count prayed in terms for *only* compensatory damages. Count I was reiterated in Count II, and an allegation of wilful and wanton conduct was added.

Count II prayed in terms for *only* punitive damages.

When the cause was submitted, the trial court gave an instruction (No. 2) embodying the theory that all payments had been made. This instruction referred to "Count I." Likewise, the court gave an instruction on the theory that defendant had promised to withhold action and referred to this as "Count II." The court further instructed the jury by Instruction 11 that if they found for plaintiff on Count I, they must find for defendant on Count II and, conversely, if they found for plaintiff on Count II, they must find for defendant on Count I. So instructed, the jury returned a verdict for plaintiff on "Count II."

The damage instructions then authorized by separate instructions actual damages on either count and punitive damages on either count.

Defendant claims instructions 2 and 4 were improperly given because they are inconsistent with the pleadings and "unfairly permitted the jury two opportunities to find against defendant."

■ The propriety of instructions 2 and 4 and the trial court's requirement by Instruction 11 of a finding on only one theory is not necessary for decision. The defendant in his motion for a new trial does not even mention Instruction No. 2. The references to Instruction No. 4 do not, in the vaguest way, raise the issue presented in the defendant's brief. The points are simply not preserved for appellate review. Rule 78.07. *Helming v. Adams,* 509 S.W.2d 159, 168 (Mo.App.1974); *Robinson v. St. John's Medical Center, Joplin,* 508 S.W.2d 7, 11 (Mo.App.1974); *Harding v. Grant City Sale Barn, Inc.,* 492 S.W.2d 99, 103 (Mo.App. 1973).

■ Defendant assigns as error the giving of the punitive damage instruction, claiming there was no evidence of wilful, wanton or malicious misconduct. As defendant states, the standard for assessment of punitive damages is that there be a wrongful act intentionally committed and without just cause or excuse. The defendant must know the act was wrongful when he did it. *Beggs v. Universal C. I. T. Credit Corporation,* 409 S.W.2d 719, 35 A.L.R.3d 1007 (Mo.1966); *Luhmann v. Schaefer,* 142 S.W.2d 1088 (Mo.App.1940). As plaintiff points out, legal malice also can arise from acts done in reckless disregard for another's rights. *Pashalian v. Big-4 Chevrolet Company,* 348 S.W.2d 628 (Mo.App.1961); *Klingbiel v. Commercial Credit Corporation,* 439 F.2d 1303 (C.A. 10, 1971). Good faith mistake is a defense to a malicious misconduct count. *Thomas v. Commercial Credit Corporation,* 335 S.W.2d 703 (Mo.App.1960).

■ In its attempt to apply these principles to the evidence, defendant claims it had no legal malice and did not intentionally do a wrongful act. It reasons that it had just cause or excuse to believe it was entitled to repossess the Price car since the plaintiff actually was in default at the time of repossession. Defendant places great weight on its assertion that there was a default, saying this is necessarily true since on Instruction No. 2 (in which the jury could have found plaintiff had made and defendant had received the February payment) there was a finding for defendant. But as plaintiff points out, the trial court in Instruction No. 11 forbade a finding by the jury that plaintiff had paid the February payment *and* that plaintiff relied on defendant's promise not to repossess. When the trial court required the jury to find for plaintiff on one theory only, if at all, it cannot be said that because the jury chose one theory it necessarily rejected the other. Clearly, there was evidence from which the jury could have found for plaintiff on the theory that the February payment was made. As plaintiff points out, proof of proper mailing creates a rebuttable presumption of receipt by the addressee and proof to the contrary when offered as it was here simply creates a jury issue. *Williams v. Northeast Mut. Ins. Ass'n,* 72 S.W.2d 166 (Mo.App.1934). Construing the verdict in the light of the instruction 11, the

propriety of which is not in issue, the verdict is equivocal on the issue of whether plaintiff was in default. There is no clear finding by the jury on that issue.

■ More importantly, the issue of default is irrelevant on this appeal because the jury found that defendant promised not to repossess, then broke its promise. So even if there was a default, an issue not decided here, the jury still had a basis to assess punitive damages if it found the acts of the defendant were done with legal malice.

■ Similarly, the fact that defendant's agent, Frank Grasa, did not know the taking was wrongful does not help defendant. Defendant's good faith must be measured against the broken promise not to repossess, not against its belief about a default. From the evidence, the jury could have found that in light of the promise not to repossess and the failure to notify the repossession agent to delay action, defendant knew or should have known the repossession was wrongful, or at the least, defendant acted with reckless disregard toward plaintiff's rights.

■ The real thrust of defendant's argument is that the corporate defendant cannot be held liable for punitive damages because those agents of the defendant actively participating did not know they were mistaken in repossession. Even disregarding the fact that Grasa had to know he was violating the promise to withhold action when he permitted the repossession to occur, the corporate defendant is bound by the knowledge of all of its agents, and it cannot make Grasa's actions proper by his ignorance of the true facts. Put another way, Grasa's misinformation, created by other agents' mistakes, does not avail the corporate defendant of the defense of good faith action. The cases cited by defendant on this point are clearly distinguishable on this point since none involve knowledge by one agent not communicated to another.

■ As plaintiff in his brief points out, the retention of possession by the corporate defendant in the face of the promise not to take possession made by Grasa (as the jury found), is an element bearing on the wilful or wanton or reckless indifference to plaintiff's rights which constitutes legal malice. *Davis v. Nash Central Motors,* 332 S.W.2d 475 (Mo.App.1960); *Thomas v. Commercial Credit Corporation,* supra.

■ Defendant also argues that it cannot be said, as a matter of law, that four days time to trace the money orders before repossession was unreasonable. Thus, the argument goes, the element of malice is rebutted by Mr. Grasa's good faith belief that his action was reasonable. Mr. Grasa's testimony was introduced through his deposition. There is nothing in his testimony to indicate he believed this time period was reasonable. To the contrary, when he made the promise to Mrs. Price, he already knew there was an order out to have the car repossessed, and he did nothing to stop that order, although he could have communicated easily to the repossession agent such an instruction. The repossession could as well have happened the morning of April 3. It is a mere fortuity that it happened four days after the promise rather than sooner. The issue was submitted to the jury, and they found against the defendant.

Defendant cites *Calhoun v. Universal Credit Co.,* 106 Utah 166, 146 P.2d 284 (1944) as "very similar" to this case. There, seller waived strict compliance with the contract and gave the buyer time in which to sell or refinance his car. After repeated attempts to contact the purchaser, defendant-seller finally notified the buyer's sister, who was the only person who could be contacted at the buyer's address, that it would repossess if the buyer did not act. The buyer did not act, and the seller repossessed. Under these circumstances, no punitive damages were allowed although the repossession was held wrongful. *Calhoun* contrasts to defendant's conduct herein. There, defendant waived what it thought was its right to repossess, fully attempted

to comply with its promise with the buyer and finally repossessed in good faith. The only similarity with the instant case is the promise to delay repossession. Defendant here made no attempt to make good its promise. Its repossession, in light of Grasa's assurance he would not, is more appropriately characterized as an act in bad faith.

█ In another assignment, defendant says the theory of liability of Instruction No. 4 will not support a punitive damages award. Defendant relies on its view that Instruction No. 4 is based on contract theory—that the instruction presented a question of *breach of agreement*, i. e., contract. It is unnecessary to reach the contract question because the wrongful act by defendant was not breach of contract but conversion. The jury found that defendant agreed plaintiff could keep the automobile at least until the matter of the unaccounted for money orders could be settled. The right of possession was in plaintiff. Defendant's taking was against this claim of right. "The law of conversion is concerned with possession, not title, and its essence is not in the acquisition of the property by the wrongdoer, but in the wrongful deprivation of it to the owner. There need only be some repudiation of the owner's right or some exercise of dominion over it inconsistent with some right." *McCullough v. Beatty Oil Company,* 444 S.W.2d 53 (Mo.App. 1969), citing 89 C.J.S. Trover and Conversion § 3, pp. 533, 534, and *Milne Lumber Company v. Michigan Cent. R. Co.,* 57 S.W.2d 732, 736 (Mo.App.1933). An action might contain elements of both breach of contract and conversion and be decided on either theory. *McCullough v. Beatty Oil Company,* supra. In the instant case, although the word "agreement" appears in the pleadings, it is clear the action was not for breach of contract, but for a tortious wrongful taking inconsistent with plaintiff's right to continued possession. Clearly, no issue appears in this case of award of punitive damages for breach of contract. The colloquy between counsel and the trial judge on a variety of occasions demon-

strates the case was tried on a theory of conversion. That the plaintiff's right to continued possession arises out of the defendant's promise to withhold repossession does not change the theory of the action which was purely in conversion.

Defendant also urges that in regard to Instruction No. 4, the trial court should have required a finding by the jury that Frank Grasa, as agent for Ford Motor Credit Company, was acting within the scope of his authority when he allegedly promised Mrs. Price not to repossess the car until the money orders could be traced.

█ Defendant correctly states that, in general, there is no presumption of agency, and that plaintiff has the burden of proof on the issue. What defendant ignores is the decisional law holding that under certain circumstances, when an issue is uncontroverted, the trial judge is not required to submit the issue to the jury in its instructions. *Davidson v. St. Louis Transit Co.,* 211 Mo. 320, 356, 109 S.W. 583, 593 (1908); *Jones v. Missouri Petroleum Products Company,* 331 S.W.2d 573 (Mo.1960). Specifically, when agency is uncontroverted, it is correct for the trial court to give instruction ignoring the issue. *Price v. Haeberle,* 25 Mo.App. 201 (1887); *Hanser v. Lerner,* 153 S.W.2d 806 (Mo.App.1941).

█ Defendant admitted that Mr. Grasa was its agent authorized to do business on accounts, including the Price account. It is clear from the record that on numerous occasions defendant's agent, Frank Grasa, and others permitted the Prices to make late payments—as much as sixty to eighty days late according to defendant's own proof. At no time did defendant argue or present evidence that its agent, Frank Grasa, acted beyond the scope of his authority. The closest approximation in the record to such an argument was the introduction into evidence of defendant's exhibit 33, the retail installment contract, and the reading of a paragraph of the contract which precluded alteration of its terms unless in writing.

No issue is here made that the provisions of the contract preclude plaintiff's recovery. Defendant's brief says several times that the trial judge overruled attempts to argue the scope of Mr. Grasa's authority. However, defendant does not show where such a request was made, and the record discloses no such request. It was not error for the trial judge to fail to include in the instructions a finding of agency or of the scope of the agent's authority.

Defendant finally urges the trial court's error in overruling of the motion for a new trial or to require a remittitur on the issue of excessiveness. Defendant contends the verdict was so excessive as to show the jury was prejudiced and biased. Defendant relies on cases where a remittitur was ordered and affirmed or where a remittitur was ordered on appeal. In these and other cases, however, it is clear that the award of punitive damages is discretionary with the jury, cannot be measured by a pre-set formula, varies according to the facts in each case and is not to be reversed except on a clear showing of abuse of discretion, e. g., *Beggs v. Universal C. I. T. Credit Corporation*, supra. The jury's discretion is particularly significant because the purpose of punitive damages is to punish wrongdoing and to deter future similar wrongful conduct. The jury must weigh, among other things, what amount this particular defendant should be made to pay so that the penalty will act as an effective deterrent. *Wisner v. S. S. Kresge Company*, 465 S.W.2d 666 (Mo.App.1971). Deference also is due the trial court when it has used its discretion and ordered a remittitur or upheld the award. *Pisha v. Sears, Roebuck & Company*, 496 S.W.2d 280 (Mo. App.1973); *Mitchell v. Pla-Mor, Inc.*, 361 Mo. 946, 237 S.W.2d 189 (1951).

In this case, it cannot be said an award of $25,000, approved by the trial court, was a clear abuse of discretion. There was a finding of conduct meriting a punitive damage award. Defendant's net worth is over 400 million dollars. It has over one million credit accounts. It is a wholly owned subsidiary of one of the nation's largest corporations.

The facts were before the jury as to the error-ridden records of the defendant, and the failure of defendant's agents to use the most elementary precautions to determine the accuracy of the information. This, added to Grasa's plain disregard of his commitment to withhold action, afford a factual basis for the jury's award. Everything considered, the award cannot be said to be so excessive as to require a remittitur, and the defendant does not couple the claim of excessiveness with any trial error indicating that the amount of the verdict arises out of passion and prejudice.

The verdict and judgment are affirmed.

All concur.